# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRADESTREAM ANALYTICS, LTD., <br><br> Plaintiff, <br><br> v. <br><br> EQUINIX, INC. and EQUINIX, LLC <br><br> Defendants | Civil Action No. <br><br><br> **VERIFIED COMPLAINT** |

Plaintiff, TradeStream Analytics, Ltd., by way of Complaint against Defendants Equinix, Inc. and Equinix, LLC, alleges as follows:

## PARTIES

1.  Plaintiff TradeStream Analytics, Ltd. ("TradeStream") is a Delaware corporation with its principal place of business at 755 Secaucus Road, Secaucus, New Jersey. Plaintiff is in the business of providing financial software solutions and trading platforms.

2.  Defendants Equinix, Inc. and Equinix LLC (collectively "Equinix") are Delaware corporations doing business in New Jersey. Equinix provides co-location services for data centers, among other things.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a) because one or more of TradeStream's causes of action arise from the Sherman Act, 15 U.S.C. § 1 *et seq.*, a federal law.

4. This Court has jurisdiction over this case pursuant to 15 U.S.C. § 15 which authorizes the federal courts to hear claims arising out of violations of the antitrust laws.

5. This action is properly venued in this Court pursuant to 28 U.S.C. § 1391 because TradeStream's principal place of business is in New Jersey, Equinix does business in New Jersey, and the events giving rise to the causes of action took place in New Jersey.

6. This action is properly venued in this Court pursuant to 15 U.S.C. § 15(a) because Equinix does business in New Jersey and therefore "is found" in New Jersey.

## FACTS COMMON TO ALL COUNTS

7. TradeStream provides, among other things, a trading platform to its customers, which it hosts on servers with a low latency data connection. Trading platforms connect to TradeStream's Back Office, an algorithmic trading and smart routing management application that routes via low latency data connections to numerous trading destinations in the financial stock and option markets.

8. In TradeStream's business, having the lowest latency possible for trades is crucial, as customers seek to make their trades as quickly as possible and in response to rapid price changes. A server with substantial bandwidth and low latency allows customers to execute their trades faster and more efficiently.

9. If a trading platform is too slow to route to trading destinations, customers will seek another platform to make their trades.

10. TradeStream's core business relies on having low latency access to stock and options trading destinations. Those "trading destinations" include both exchanges and so-called non-exchange destinations, such as the electronic trading engines of banks, brokerage institutions,

and major hedge funds. Without low latency access, TradeStream would be unable to conduct its business of smart routing to those trading destinations.

11. Equinix operates multiple data centers at 755 Secaucus Road, Secaucus, collectively known as "NY4", where it provides co-location services. Co-location facilities allow a customer to rent space for servers in close proximity to the electronic trading destinations. The range of services provided by Equinix at NY4 includes providing power for the servers, cooling for the servers, access to the data center's bandwidth, and physical security.

12. Equinix offers cross-connects to major securities exchanges and non-exchange trading destinations co-located at NY4 for even lower latency.

13. The financial exchange "ecosystem" created by Equinix arose only during the past several years and is unprecedented in United States business and securities trading history. Equinix's acquisition of data centers operating the NASDAQ Exchange and numerous other exchanges has occurred very quietly, with little or no public notice or discussion.

14. For example, a recent press release by Equinix touting the acquisition of 29 data centers from Verizon in December 2016 failed to mention that adding those data centers would substantially increase the control of low-latency access to the trading volume of stocks and options in the United States.

15. Unless one uses Equinix's services, there is no other low latency access available to the NASDAQ Exchange ("NASDAQ"), Boston Stock Exchange ("BOX"), Philadelphia Stock Exchange ("PHLX") International Securities Exchange Holdings, Inc. ("ISE"), BATS Trading, EDGA Exchange and EDGX Exchange, the Chicago Board Options Exchange ("CBOE") or the Miami Stock Exchange ("MIAX") for stocks and options.

16. Equinix access to these markets represents approximately 85% of the daily options volume and about 66% of the exchange-listed stock volume.

17. **Except for the New York Stock Exchange ("NYSE") equities and options, Equinix actually controls 100% low-latency access to all stock and options markets.**

18. If the other trading destinations domiciled at NY4 are included, (*i.e.*, JP Morgan, Bank of America, Morgan Stanley, etc.), Equinix controls access 75% of the daily stock volume traded in the United States, or almost 5 billion shares per day.

19. For example, CBOE is the largest options exchange in the world. CBOE co-locates at the Equinix NY4 data centers on an "exclusive" basis. By providing Equinix with an exclusive co-location arrangement, the CBOE provides Equinix with a monopoly over low-latency access to its exchange services.

20. The same exclusive relationship exists for all other options exchanges except for NYSE options; thus Equinix controls low-latency access to 85% of the daily option trading volume.

21. Upon information and belief, Equinix has other exclusive arrangements with other financial exchanges or non-exchange trading destinations, not only in the United States, but also worldwide.

22. Equinix controls 100% of low latency access to non-exchange trading destinations.

23. In effect, Equinix currently controls access to almost 100% of all stock volume except for NYSE, which amounts to roughly 5 billion shares per day or 75% of all volume traded in the United States.

24. Equinix controls sole access to NASDAQ, MIAX, ISE, PHLX, BOX, CBOE, ISE, BATS, and EDGE options exchanges, representing 100% of the low latency access to these exchanges and 85% of the entire trading volume in the United States.

25. In 2014, Equinix and TradeStream entered into an agreement for services at NY4. Among other things, TradeStream rented server space within a "cage," wherein TradeStream would have an exclusive physical space for its servers, blocked off by mesh walls.

26. Thereafter, TradeStream installed and began operating its own servers within the cage rented from Equinix.

27. The servers within the cage are the property of TradeStream.

28. In September and October 2016, TradeStream sought to upgrade its equipment by installing new servers and cables on behalf of several customers requiring low-latency access. Upon completion of the installation, the customer's routing and execution volume would generate an additional $300,000 in revenues per month.

29. TradeStream spent over $120,000 for new state-of-the-art servers and equipment in September 2016, to be installed at Equinix.

30. By early November, TradeStream had already installed most of the new equipment, but required additional fiber cables with special connections to wire the remaining 32 servers that had not been installed yet.

31. TradeStream sent a large order of cables to the Equinix facility to complete the installation and upgrade. The cables were intended to be used to cross-connect two new switches to the new servers and replace slower copper cables.

32. At the time, TradeStream was current on its accounts to Equinix.

33. On November 18, 2016, Equinix confirmed that it would receive, a shipment from TradeStream, by United States Postal Service ("USPS"), of 60 fiber cables to TradeStream's space rented from Equinix. The shipment was scheduled for November 19, 2016.

34. Equinix refused the delivery on November 19, 2016. After TradeStream informed Equinix of the improper refusal, Equinix assured TradeStream that it would receive the package if delivery was rescheduled.

35. The delivery was then rescheduled for November 21, 2016. Equinix then refused the November 21, 2016 redelivery. In the past, Equinix had always permitted delivery by USPS.

36. Because the installation required very sophisticated programming of the switches, only an agent of TradeStream with expertise could perform the installation, TradeStream's agent would be required to be on premises, and the installation could only be performed when the trading market is closed, ideally during the weekend. These constraints limited the window of opportunity to perform the upgrade.

37. From November 19, 2016 to November 22, 2016, when the cables were originally scheduled to be delivered, an agent of TradeStream had flown in to New Jersey to install the cables and switches.

38. In addition to the damages suffered by TradeStream from the wasted travel, time and associated costs, Equinix caused injury to TradeStream by preventing TradeStream from improving its service to its customers.

39. Because of the events described above, TradeStream disputed the November invoice, which was payable November 30, 2016.

40. TradeStream attempted to resolve the problems with Equinix through several communications, but Equinix provided inconsistent responses, including statements that the goods

were delivered, that management approval was required for deliveries, and that the facility did not handle USPS deliveries at all. In one telephonic communication, a representative of Equinix stated that Equinix would provide credits to TradeStream for the misunderstanding. No credit was provided.

41. Due to difficulties in scheduling, a representative of TradeStream was not able to visit the Equinix facility again until late January. When Equinix rejected the shipments, Equinix was aware and notified of the fact that a representative would not be able to visit the facility again until that time.

42. Nonetheless, by January 9, 2017, Equinix had locked TradeStream out of its cage citing TradeStream's failure to pay the November invoice for services that TradeStream did not owe.

43. In December and January, Equinix also rejected three later shipments to the facility to further upgrade its servers. Equinix sent back the shipments to the senders, who are major exchanges (such as the Chicago Stock Exchange), further embarrassing TradeStream with its customers.

44. As a result of being locked out and not receiving the deliveries, TradeStream has not been able to install the cables and upgrade its systems, or physically access its servers. Because TradeStream had already removed its older components, only one rack of servers out of five is currently operational.

45. As a result of not being able to install the cables, TradeStream has suffered at least a $25,000 monthly loss of revenue since mid-December. Contracts that would increase revenues an additional $300,000 per month had to be put on hold in early February. Additional contracts are now pending, but Tradestream has no ability to execute such contracts due to its lack of access

to its servers. As a result, the servers were not able to be configured with the new cables, and Tradestream has lost over $1.2 million in revenue since February, and climbing at the rate of $300,000 per month.

46.  On March 13, 2017, TradeStream's CEO and its attorney attempted to enter the cage, and were denied, even though TradeStream's property is in the cage.

47.  Since Equinix refused delivery of the cables in November, TradeStream has attempted to resolve the situation amicably. At this date, Equinix is no longer responding to TradeStream's or its counsel's calls or emails.

48.  Equinix has indicated that it intends to lock TradeStream out of the NY4 facilities in the immediate future.

49.  Being prevented from using Equinix's NY4 facilities would result in a delay of a minimum of 5 to 10 milliseconds in routing and executing trades. This delay is unacceptable to financial firms that do business with TradeStream or would consider doing business with TradeStream.

50.  During the months of December through May 2017, Equinix has continued to invoice for services that have not been received. Such services include power to the cage and rack space. By not allowing the installation to be completed, Tradestream has only used 20% of the space and 20% of the power. Nevertheless, despite disputing such invoicing, Equinix continues to invoice and attempt to collect for services not received due to Equinix's actions of preventing the server installations from being completed.

51.  At the time when Equinix began denying TradeStream access to the servers, TradeStream was paid on time and current with all invoices.

52. To this day, Equinix will not explain why they sent back 4 shipments when Tradestream was in the middle of a major server and switch upgrade, thus causing TradeStream's network to be compromised.

53. Equinix refuses to deal with its customers routine customer complaints, and does so by reason of its monopoly position because Equinix knows that its customers cannot obtain services from any other service provider.

## COUNT ONE
### (Violation of the Sherman Act)

54. TradeStream repeats and re-alleges the allegations of Paragraphs 1 through 53 above as if they were fully stated herein.

55. Equinix maintains a monopoly over low latency access and co-location to major trading destinations.

56. For independent trading destinations other than NYSE, Equinix effectively controls 100% of the low latency access.

57. Equinix controls sole access to NASDAQ, BOX, MIAX, PHLX, CBOE, ISE, BATS, and EDGE options exchanges, representing 100% of the low latency access to these exchanges.

58. Equinix effectively controls 100% of the access to stock and option markets via geographically central fiber connection links (known as POP links) to the NYSE.

59. All in all, Equinix controls direct low latency access to approximately 75% of all stock trading and 85% of all options trading in the United States through NY4. This number is 100% for both options and stock trading volume if the current POP links are included.

60. Due to the monopoly on access maintained by Equinix, it is effectively impossible to do business anywhere else.

61. Low-latency access is an "essential facility" for the conduct of TradeStream's business. TradeStream's customers, many of whom are members of the very securities exchanges that Equinix controls low latency access to, require connectivity inside NY4 because of Equinix's monopoly of low-latency access to financial exchanges.

62. Co-location is an "essential facility" for the conduct of TradeStream's business.

63. The unique combination of low latency access and co-location provided by Equinix cannot be obtained elsewhere.

64. TradeStream is unable to obtain the same combination of co-location and low latency access provided by Equinix from any other provider. Using any provider other than Equinix would result in delays of 5 to 10 milliseconds minimum, which will cause TradeStream to lose its current business and be unable to attract new business.

65. If TradeStream is forced to use a provider other than Equinix, TradeStream's ability to do business will be destroyed.

66. Equinix, by its actions, has wrongfully refused to deal with TradeStream and has denied TradeStream use of its essential facilities.

67. Equinix, by its actions, has violated Section 2 of the Sherman Act.

68. TradeStream has been injured by Equinix's actions. Among other things, TradeStream has suffered at least a $25,000 monthly loss of revenue since mid-December 2016, and $300,000 monthly since February 2017.

69. TradeStream will suffer irreparable injury if Equinix is permitted to continue its unlawful conduct.

70. TradeStream will suffer irreparable injury if it is locked out of the NY4 facilities and denied access to its servers.

71. Monetary damages are insufficient to repair TradeStream's relationships with its customers, as the current inability to provide a high bandwidth, low latency connection is harming TradeStream's reputation.

WHEREFORE, TradeStream seeks entry of judgment in favor of TradeStream and against Equinix, Inc. and Equinix LLC:

(a) enjoining Equinix from violating the Sherman Act by denying TradeStream access to essential facilities;

(b) awarding treble damages as authorized in 15 U.S.C. § 15(a);

(c) awarding reasonable attorneys' fees and costs of suit, as authorized in 15 U.S.C. § 15(a); and

(d) awarding such other relief as the Court deems just and proper.

## COUNT TWO
### (Intentional Interference with Prospective Economic Advantage)

72. TradeStream repeats and re-alleges the allegations of Paragraphs 1 through 71 above as if they were fully stated herein.

73. TradeStream has a protectable interest in the economic gains from its customers paying for TradeStream's services.

74. TradeStream has a reasonable expectation that its customers would use the platform because of TradeStream's ability to provide a high bandwidth, low latency connection for trades.

75. Equinix interfered with TradeStream's business when it denied the shipments for its faster, server-compatible cables and when Equinix locked TradeStream out of TradeStream cage, thus preventing TradeStream from completing the upgrade and installation of its new servers.

Because Equinix interfered, the speed and the ability to use TradeStream's servers has been substantially reduced.

76. Because TradeStream's customers rely on TradeStream's ability to provide low latency access as well as high bandwidth for timely, efficient executions and other co-location related services, the inability to increase the bandwidth of the servers and provide contracted co-location services has resulted in the loss of customers using TradeStream's platform.

77. Monetary damages are insufficient to repair TradeStream's relationships with its customers, as the current inability to provide a high bandwidth, low latency connection is harming TradeStream's reputation.

78. Equinix intentionally prevented TradeStream from performing the installation and knew that denying TradeStream the ability to upgrade would significantly impact TradeStream's business.

79. Equinix had no justification or excuse for denying the shipments and locking TradeStream out of its cage.

80. Equinix acted knowingly, maliciously and in wanton and willful disregard to TradeStream's rights.

WHEREFORE, TradeStream seeks entry of judgment in favor of TradeStream and against Equinix, Inc. and Equinix LLC:

(a) awarding compensatory damages;

(b) awarding consequential damages;

(c) awarding punitive damages

(d) enjoining Equinix from interfering with the delivery of goods to TradeStream;

(e) enjoining Equinix from interfering with TradeStream's personnel's access to the

area licensed to Tradestream; and

(f) awarding such other relief as the Court deems just and proper.

## COUNT THREE
### (Conversion)

81. TradeStream repeats and re-alleges the allegations of Paragraphs 1 through 80 above as if they were fully stated herein.

82. The servers, cables, switches and other equipment, and the data thereon located inside Equinix's cage are the property of TradeStream.

83. Equinix locked TradeStream out of the cage in which the equipment is located.

84. By locking TradeStream out of the cage, Equinix has repudiated TradeStream's rights and wrongfully exercised dominion over TradeStream's property.

85. Equinix acted knowingly, maliciously and in wanton and willful disregard to TradeStream's rights.

WHEREFORE, TradeStream seeks entry of judgment in favor of TradeStream and against Equinix, Inc. and Equinix LLC:

(a) awarding compensatory damages;

(b) awarding consequential damages;

(c) awarding punitive damages;

(d) enjoining Equinix from interfering with the delivery of goods to TradeStream

(e) enjoining Equinix from interfering with TradeStream's personnel's acces to the area licensed to Tradstream;

(f) awarding such other relief as the Court deems just and proper.

Dated: June 28, 2017

JARDIM MEISNER & SUSSER, P.C.
30B Vreeland Rd., Suite 201
Florham Park, NJ 07932
Tel. 973-845-7640
Fax 973-845-7645
Attorneys for Plaintiff

By: /s/ *signature*
RICHARD MEISNER
ALISSA PYRICH